## O'Hara's Estate.

559

Argued May 7, 1935.

Before KELLER, P. J., CUNNINGHAM, BALD-
RIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Elverton H. Wicks,* for appellant.

*John J. Bane,* for appellees.

OPINION BY BALDRIGE, J., July 18, 1935:

Winifred O'Hara, a widow 83 years of age, died
testate the 16th day of April, 1933. She left an estate
of about $10,000. After payment of specific legacies
and taxes, approximately $7,000 was left to pay claims
and for division among the residuary legatees, consist-
ing of six children and several grandchildren.

Bridget Lanigan, a daughter of the deceased, who
had for five years continued in the undertaking busi-
ness in which her husband had been engaged prior to
his death, presented two claims, one in the amount of

$270 for burying decedent's bachelor brother, Thomas Donahue, who died May 22, 1932, and the other in the sum of $3,440.85, charges for her mother's funeral which she conducted. At the audit of the estate the claimant admitted a profit of $1,500 on the $3,000 casket, and reduced her claim to the sum of $1,940.85. In the adjudication of the account, the judge disallowed claim for the uncle's burial and reduced the claim for her mother's funeral to $508.35. This action was affirmed by the court in banc. This appeal followed.

The appellant attempted to establish the claim for funeral expenses of Thomas Donahue by proving a contract with her mother to assume that obligation. She testified that about an hour after her uncle's death, her mother requested her to bury him, saying, "If you can't get it any place else I will pay it." Mrs. Ferguson, one of Mrs. O'Hara's daughters, stated that about the same time as the alleged promise testified to by claimant she heard Mrs. Lanigan ask her mother if she would pay her brother's funeral expenses, and she refused to do so, as he had $600 of his own. There was testimony that Donahue had loaned his niece, Mrs. Crickton, $600 and that this was known among the members of the family. Mrs. Crickton had a conversation with the claimant a few days after the funeral, to whom she stated that owing to business conditions she was poor and unable to pay the bill, but would do so as soon as she had the money; that the claimant wrote Mrs. Crickton once or twice reminding her of the unpaid bill for the funeral and requesting payment. It appeared also that after Donahue's death, and prior to his burial, the claimant went to the post office to obtain his mail, as she expected that Mrs. Crickton, prior to his death, had sent him a check for $300 from Cleveland where she resided. Although eleven months elapsed before the mother died, the claimant never sent her a bill, but she stated that about six months after this indebtedness

had accrued she asked her mother for some money and she replied that she did not have it but would pay when she got it. The claimant admitted, however, that at all times the mother had sufficient money in bank to pay the claim.

We think there was sufficient evidence to justify the court below in concluding that there was no promise on the part of the mother that would bind her estate. If the alleged promise was made, it was but an agreement to become a guarantor for the estate of Thomas Donahue, which was primarily liable for this obligation, and fell within the statute of frauds, which required it to be in writing: Seabrook v. Betz, 308 Pa. 333, 162 A. 260. This was not an original undertaking to subserve some interest or purpose of the alleged promisor, as in Elkin v. Timlin, 151 Pa. 491, 25 A. 139, and Weber & Co. v. Bishop, 12 Pa. Superior Ct. 51, cited by appellant, as Mrs. O'Hara did not derive any individual advantage from the alleged agreement.

We find no error in the rejection of this claim.

We can see no warrant for purchasing the costly casket and some of the other items for the mother's funeral. The claimant attempted to justify the charge under alleged instructions of the deceased to her son, John, three days before she died, when she said to him, "I want you to take care of everything." He accompanied the claimant to the wholesale house to select the casket, but none of the other heirs, or the Bessemer Trust Company, the executor, were consulted in regard thereto. No doubt it would have been repugnant to the deceased herself if she could have realized that her remains were enveloped in a velvet slumber robe costing $35, and reposed in a solid bronze casket with silver-plated handles, that $25 had been spent for a crape, $25 for ferns and palms, $8 for gloves for carriers, etc. Parties interested in estates of the dead will be protected from such a lavish outlay of money for funerals,

especially when it is entirely disproportionate to the size of the estate. It has been the wise policy of the courts to approve only claims for funeral expenses that bear a fair and reasonable proportion to the amount of the estate of a deceased and his situation in life. When undertakers make sales of expensive caskets and pretentious burial accessories, they run the risk of having their claims disallowed.

We think the court below exercised sound judgment in reducing this excessive claim.

Decree of the court below is affirmed at appellant's costs.